

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 26, 2021

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Derrek Larkin,* 19 Cr. 833 (SHS)**
***United States v. Joseph DePaola,* 19 Cr. 833 (SHS)**

Dear Judge Stein:

The Government respectfully submits this letter in connection with the sentencings of Derrek Larkin and Joseph DePaola, currently scheduled for August 2, 2021.

In connection with sentencing, the Probation Office has determined that the applicable Guidelines range for Larkin is 151 to 188 months' imprisonment (*See* Larkin Presentence Report dated April 13, 2021 ("Larkin PSR") ¶ 108). As set forth in the parties' plea agreement dated January 11, 2021 (the "Larkin Plea Agreement"), the Government submits that the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") for Larkin is 92 to 115 months' imprisonment (the "Larkin Stipulated Guidelines Range"). Probation recommends that Larkin receive a sentence of 92 months' imprisonment, the bottom of the Larkin Stipulated Guidelines Range. (Larkin PSR p. 35).

The Probation Office has determined that the applicable Guidelines range for DePaola is 51 to 63 months' imprisonment (*See* DePaola Presentence Report dated April 19, 2021 ("DePaola PSR") ¶ 108). As set forth in the parties' plea agreement dated January 20, 2021 (the "DePaola Plea Agreement"), the Government submits that the applicable range under the Guidelines for DePaola is 46 to 57 months' imprisonment (the "DePaola Stipulated Guidelines Range").[1] Probation recommends that DePaola receive a sentence of 36 months' imprisonment. (DePaola PSR p. 26).

For the reasons set forth below, the Government respectfully submits that both Larkin and DePaola should receive a sentence within their respective Stipulated Guidelines Ranges.

---

[1] Because DePaola joined the conspiracy in 2018, DePaola was not serving a criminal justice sentence at the time of his offense, and has one criminal history point, not three. (*See* PSR ¶ 51).

## I. Background

### A. Roles in the Offense

Since early 2016, the Government, in partnership from the New York City Police Department ("NYPD") and Homeland Security Investigations ("HSI"), has been investigating a large-scale telemarketing scheme targeting elderly and vulnerable victims (the "Victims") throughout the United States. As the Court learned while presiding over the related case (and trial) in *United States v. Ketabchi*, 17 Cr. 243 (SHS), Victims all over the country were convinced to invest their entire life savings, drain their retirement funds, and incur tens of thousands of dollars in credit card debt based on false and fraudulent pretenses, representations, and promises, including representations made by the *Ketabchi* defendants that the Victims would earn money through an "online business" created and managed by those defendants and their co-conspirators (the "Business Opportunity Scheme"). In fact, the businesses did not exist, and the Victims never made any money.

In the *Ketabchi* case, the Government prosecuted William Sinclair and Michael Finocchiaro for their role in operating Olive Branch Marketing, which sold business opportunity products, and later Consumer Shield, which convinced Victims of the Business Opportunity Scheme to spend additional money on debt relief products. In mid-2017, following the March 2017 arrests of Sinclair and Finocchiaro, HSI conducted a search at the home of Derrek Larkin and his co-defendant and wife, Mattie Cirilo. As the 2017 search confirmed, Larkin had worked as a salesperson at Olive Branch as well as Consumer Shield, and had opened up merchant accounts for use by those telemarketing businesses. Larkin was not charged in the *Ketabchi* case.

This Court presided over the *Ketabchi* trial in late 2018. DePaola, who was close friends with Andrew Owimrin, personally attended some of the *Ketabchi* trial, undoubtedly becoming aware that the *Ketabchi* criminal case arose from the *Ketabchi* defendants' perpetration of the Business Opportunity Scheme.

Following the resolution of the *Ketabchi* case in late 2018, the Government's investigation shifted to those telemarketing sales floors that continued to operate in the New York and New Jersey area despite the *Ketabchi* case, including Corporate Development Center ("CDC") and Alliance Education ("Alliance" and, collectively "CDC/Alliance"), sales floors run by co-defendants Joseph Ciaccio and Joseph Minetto, among others. In January 2019, HSI executed a search warrant at the CDC/Alliance office in Englewood, New Jersey, during which search HSI collected paper documents and electronic devices from the employees who were present, including Larkin and DePaola. DePaola agreed to be interviewed by HSI, but Larkin did not. Evidence collected during the search revealed that as of January 2019, Larkin and DePaola both worked as salespeople at CDC/Alliance, with Larkin primarily setting appointments and obtaining information Victims' financial information and DePaola primarily acting as the "closer" during the sales calls. Following the January 2019 search, Larkin (in coordination with others) remotely deleted the data on his cellphone before that cellphone was accessed by HSI, thereby destroying any evidence of his conduct that might be on that device. Shortly after HSI discovered this, a cooperating witness (the "CW") made a consensual recording of Larkin in which he acknowledged

that he had deleted the contents of his cellphone after it was seized by HSI and instructed the CW how the CW could do the same.

Larkin and DePaola were arrested on November 20, 2019. Larkin and DePaola pleaded guilty to wire fraud conspiracy pursuant to plea agreements in January and February 2021, respectively.

## II. Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## III. The 3553(a) Factors Support a Sentence within the Stipulated Guidelines Range for Both Defendant Derrek Larkin and Defendant Joseph DePaola

A sentence within the Stipulated Guidelines Range would be sufficient and not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense for Larkin and DePaola. Such a sentence would also afford adequate deterrence to criminal conduct and would avoid unwarranted sentencing disparities among similarly situated defendants.

The defendants each participated in a widespread and sophisticated scheme in which Victims all over the country were convinced to invest their entire life savings, drain their retirement funds, and incur tens of thousands of dollars in credit card debt based on the defendants' false promises and representations that the Victims would earn money through an "online business" created and managed by the defendant's co-conspirators. In fact, there were no such businesses and the Victims never earned the money they were led to believe they would earn.

Larkin's participation in the charged crime was extensive in its duration as Larkin worked as a salesperson at both Olive Branch Marketing and Consumer Shield, where he perpetrated both the Business Opportunity Scheme and the Debt Relief Scheme for years prior to Olive Branch and Larkin's home being searched by law enforcement in 2017. Notwithstanding this search, and Larkin's knowledge that his former employers had been charged criminally, Larkin began working in another Business Opportunity Scheme sales floor when he went to work for CDC/Alliance. In his role at CDC/Alliance, Larkin continued to work on sales, with responsibility for collecting Victim financial information before passing the Victim off to a closer to complete the sale.

Though a sentence for Larkin within his Stipulated Guidelines Range of 92 to 115 months' imprisonment would be longer than the sentences imposed on more senior members of the Scheme, such a sentence is warranted in light of Larkin's significant criminal history, role in recruiting others (namely his wife) into criminal activity, as well as Larkin's efforts to obstruct justice by remotely deleting data from his cellphone.

While DePaola's participation in the charged crime was limited in time and scope, he was undoubtedly aware of the seriousness of the scheme after attending portions of the *Ketabchi* trial, and after his friend Owimrin was convicted and sentenced to prison. Instead of finding another

way to earn money in 2018, DePaola instead chose to work at CDC/Alliance where he personally defrauded Victim after Victim into investing in BizOp. While DePaola seeks a below-Guidelines sentence based on his purported extraordinary acceptance of responsibility, that acceptance began only after DePaola was caught and prosecuted for the instant offense, and does not support the sentence he seeks even in light of the mitigating personal circumstances he presents to the Court.

**IV. Conclusion**

Based on the foregoing, a sentence for each defendant within their applicable Stipulated Guidelines Range would be sufficient but not greater than necessary to serve the aims of sentencing in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: ______________________________
Kiersten A. Fletcher
Robert B. Sobelman
Sheb Swett
Assistant United States Attorneys
(212) 637-2238/2616/

Cc: Counsel of Record (by ECF)