UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 833 (SHS)

DERREK LARKIN,
a/k/a "Derrek Martin,"

Defendant.

Sentence
------------------------------x

New York, N.Y.
August 2, 2021
11:00 a.m.

Before:

HON. SIDNEY H. STEIN,

District Judge

APPEARANCES

AUDREY STRAUSS
United States Attorney for the Southern District of New York
BY: KIERSTEN A. FLETCHER
Assistant United States Attorney

JEFFREY H. LICHTMAN
JEFFREY B. EINHORN
Attorneys for Defendant

(Case called; appearances noted)

THE COURT: Good morning. Please be seated in the courtroom.

I have the presentence report for Mr. Larkin, prepared on March 16 of this year and revised on April 13 of this year, along with the addendum and sentencing recommendation of 92 months. That's a variance from the guideline range of 151 to 188 months. Total offense level of 29, criminal history category of VI, that's the recommendation of the probation department.

I also have the submission of Mr. Larkin, dated July 20, along with the attached letters and pictures, and I have received a July 26 submission of the government, which is document 312, concerning both Mr. Larkin and Mr. DePaola.

Is there any other information I should have?

Mr. Lichtman.

MR. LICHTMAN: Nothing from the defense, your Honor.

THE COURT: From the government.

MS. FLETCHER: Your Honor, as it relates to this defendant and the remaining defendants in this case, the government submitted its letter on July 22 in which we set forth our view as to the relative culpability of the defendants in this case and in the Ketabchi case.

THE COURT: Yes. I have that relevant culpability letter.

MS. FLETCHER: Thank you.

And this morning I handed up to Ms. Blakely a signed forfeiture order, consent forfeiture order for the Court to enter.

THE COURT: Oh, yes. I see it on my desk. It provides for forfeiture of $650,000, and I am signing it, dated today. That will be part of the judgment in this case.

Mr. Lichtman, do you have any objections to the findings of fact in the presentence report, and does your client have any objections to the findings of fact?

MR. LICHTMAN: Judge, one regarding the findings of fact, which was a very minor one, with regard to when he started in this scheme. Probation had said December of 2015.

THE COURT: What paragraph are you on, sir?

MR. LICHTMAN: That's paragraph 22. This is a minor one, Judge.

THE COURT: Yes.

MR. LICHTMAN: It's our contention, and I believe the government agrees, as per our reviewed allocution, that he actually began in 2016 as opposed to December 2015.

THE COURT: January 2016?

MR. LICHTMAN: Yes.

THE COURT: What's the position of the government?

MS. FLETCHER: That's fine, your Honor.

THE COURT: Does the government have any objections to

the findings of fact?

MS. FLETCHER: No, your Honor.

THE COURT: I'm going to adopt the findings of fact in the presentence report with the following change:

At paragraph 22, I am changing December 2015 to January 2016, and I am striking footnote No. 1.

Again, I'm adopting the findings of fact with the exception that, in paragraph 22, I am changing December 2015 to January 2016, and I am striking footnote No. 1.

Anything else, Mr. Lichtman?

MR. LICHTMAN: Judge, with regard to the three points of acceptance and with the understanding that I read the transcript from Mr. Larkin's wife's sentencing, where you gave your opinion on the thought -- on the issue of whether or not someone could get three points for acceptance off while at the same time getting an adjustment upward due to obstruction, if I can be heard briefly on, that Judge.

THE COURT: Yes. There's nothing extraordinary about this.

I'm glad you did read the sentencing transcript of Ms. Cirilo. The facts are factually different in each case, but the law is that unless there is something that's extraordinary here, you don't get, I think it's 4E1.1, application note 4.

I don't have it directly in front of me. Just one

moment.

No. That's the wrong citation.

3E1.1, application note 4. There's nothing extraordinary here, so I find, just as I did in the case of Ms. Cirilo, that he is not entitled to acceptance points.

MR. LICHTMAN: Judge, can I just be briefly heard on this?

THE COURT: Of course.

MR. LICHTMAN: You know, I can understand if there was obstruction that occurred after the case began. I think that makes sense because how can you claim that you're accepting responsibility when, after the case started, you did everything you could to not accept responsibility? And in this case, the obstruction occurred about nine or ten months before the charge.

Once the case started, once we got into the case, he immediately sought a plea deal, which is what we did. I understand that probation wrote in the report that it wasn't extraordinary because one of the reasons was that when he was being questioned during the presentence interview, he was silent. He gave an allocution, obviously, but Judge, I would give an example as this.

You get indicted in a case, you fight the case for two years, two days before the trial, you're getting, all the motions *in limine* are decided. You've already had jury

questionnaires filled out and you've already picked a jury, right before the trial starts you decide to plead guilty that day. You still get two points for acceptance.

And in this situation, he's done so much more. He relieved the government of so much work by pleading as early as he did, and the cases which have denied the three points is the situation like -- we cited, the *Ray* case, where after the person pleads guilty, he's still claiming that he's innocent. In the *Lawani* case, the defendant committed perjury after he pled guilty.

In this case, I think that if you look at it temporally, once the case started, there was nothing that he did that did not suggest he was accepting responsibility. Had he obstructed after the bell had rung, so to speak, I can certainly understand the reasoning.

THE COURT: That's not the test under the application note. The application note is advisory; I understand that, but that's really not the test. I understand your position. I disagree with it.

Let me hear from the government.

MS. FLETCHER: Your Honor, understanding that the Court disagrees with the defendant's position, the government -- there is a plea agreement in this case.

THE COURT: I'm sorry. There's a what?

MS. FLETCHER: There's a plea agreement in this case.

The government, as part of its plea agreement, did give the defendant the three acceptance points. The government's view is similar to Mr. Lichtman's, which is that because the defendant's obstruction preceded both in time and -- preceded in time the bringing of this case against him and because the defendant did accept responsibility after the case was filed, the government thought it appropriate to apply both acceptance points and obstruction points here, as it had with Ms. Cirilo. I understand the Court disagrees with that, but that's the government's position.

THE COURT: All right. Fine. I appreciate that, and I don't want there to be hobgoblins here in terms of consistency, but I believe it is exactly as it was in the case of Ms. Cirilo. I will put on the record that at least in terms of my current intention in sentencing, which is for a variance, that my position would be the same; that is, the sentence would be the same regardless of whether I grant the acceptance of responsibility points or not, because I am doing a variance.

Does that assist, sir?

MR. LICHTMAN: Yes, Judge. That's fair.

THE COURT: All right. I've made my decision. I've heard you both.

I adopt the findings of fact with the noted minor change.

I told you, in essence, that I'm determining that

there is an offense level of 29, criminal history category VI, guideline range of 151 to 188. That's too high, and I am going to vary.

I've read all of this information. A couple things stand out here, sir, that you have to address, and the letters deal with. The letters are really quite nice. They're very warm, speak to his involvement with his family, his good deeds, his work. I mean, my goodness, an ironworker at $35 an hour with the potential of making $50 an hour. That's really most unusual in terms of the people I see. Loving family. That's just great. It really is, and I am not sarcastic. But here is my question, in part, sir.

Criminal history category VI. 70 months. 70 months. What kind of person -- that's the wrong way to put it. What is the thinking behind serving time as a very young man for stealing power tools, for violating an order of protection brought by his own mother and stepfather, serving time as a kid -- or as a young man, not as a kid. As a kid, he seems to have been sentenced to that school where they used physical abuse.

What kind of person has a taste of incarceration, has a major criminal drug conviction, goes away for more than five years, knows about the Ketabchi case, gets involved in Olive Branch Marketing, does this? People are complicated, but this one makes no sense.

MR. LICHTMAN: Well, I'm going to try to make some sense of it.

THE COURT: Go ahead.

MR. LICHTMAN: Because, Judge, this is -- I've been doing this for 30 years. I had Kam Wong.

THE COURT: I've got you beat, sir. Go ahead.

MR. LICHTMAN: I had the Kam Wong case in front of you, which was also a troubling case, and I guess every case I have in front of you --

THE COURT: He spends more than five years in federal prison.

MR. LICHTMAN: I'll explain it.

THE COURT: He knows this thing stinks --

MR. LICHTMAN: You're 100 percent right.

THE COURT: -- and goes ahead and does it.

MR. LICHTMAN: But I think that you have to look at every one of these cases and say how does somebody, with reasonable intelligence, who should know better, because he learned from the other case, how does this happen? It doesn't happen in a vacuum, and I would say, Judge, if you look back to the beginning, you can see something, how the seeds of this get planted and get started.

By the time he was 18 years old, when I was getting ready to go off to college, he was homeless. He was kicked out of his house. He was raised by parents -- he had a difficult

situation with his father. He was abused. He then had a stepfather, who abused him as well.

Judge, I'm not suggesting, you know, the dog ate my homework and these are all excuses. I'm just trying to make sense of how we're here right now.

By the time he's 18 years old, he's gone through a boarding school that eventually gets shut down. He was getting abused by his father and stepfather. They send him because he's having all sorts of difficult -- shockingly, difficult behavioral issues.

THE COURT: So he throws a full beer bottle at somebody's face, requiring 125 stitches, and then says: Oh, you're the wrong guy. Excuse me. Don't go to the police.

MR. LICHTMAN: I would just suggest this, Judge, that I think that this, to just look past how he was raised, the difficulties -- we don't come out bad, Judge. We come out, we're all equal, from birth. From birth --

THE COURT: He's not bad. He's got a lot of good things in him.

MR. LICHTMAN: But that's my point.

THE COURT: He's not a bad person.

MR. LICHTMAN: But there are bad things that occurred to him which triggered this, which started this cycle. As I said, getting abused when he was a kid, he gets sent off to boarding school where he's abused some more. Suddenly, at age

18, when I'm packing up for college, he's homeless. He goes back into his house to get a snowblower, and that's when the criminal history starts. And that's when the cycle starts, and it's one after another. And Judge, it's tough.

The great majority of the criminal history here occurred between the ages of 18 and 22. It's hard to get a job.

THE COURT: A 70-month federal crime?

MR. LICHTMAN: Well, I didn't mention that. I'm going to get to that. You had to bring that up, Judge.

It's very difficult to get a job and be on the street.

THE COURT: It's not easy to be in criminal history category VI, sir.

MR. LICHTMAN: I've had two of them.

THE COURT: It takes some effort.

MR. LICHTMAN: I've had two of them in 30 years, I think. You're right.

What I would say is that you can see how this happens. I'm not suggesting that it's right or that it's an excuse, but were both trying to understand how this can happen. And it's impossible, at age 22 with the criminal history that he had, all of a sudden he's going to work into a place and get a job; they're going to do a background check and he's finished.

THE COURT: He's in criminal history category VI, and it looks like he's got a great union job.

MR. LICHTMAN: Now he does, and I think what's happened is that he realized that he didn't have to be on this path. It's not like he did this for huge money, Judge. He made almost no money.

THE COURT: I hope the union keeps him on after he gets out of his lengthy prison term.

MR. LICHTMAN: Judge, the crime that we're here for today, he made a fraction of the money that everybody else made. He wasn't doing this --

THE COURT: And therefore?

MR. LICHTMAN: What I think it tells you is that perhaps the guidelines are not reflective of his actual culpability here; that he was not a leader, because if he was a leader, he'd make millions. You've got people in this case, Judge, that were living ridiculously lavish lives.

THE COURT: I don't understand the relevance of that to this sentencing except in terms of my adjusting the *inter se* of sentences such that they make sense.

MR. LICHTMAN: I think what I'm trying to show you, Judge --

THE COURT: On that scale, I'm not sure how you come out given the substantial sentences that have arisen out of the Ketabchi case.

MR. LICHTMAN: I think what I would say is, Judge, that if he was doing this because he thought this an

opportunity to get rich, that he was taking shortcuts, that I would understand your point more. He was doing this and made almost no money. He was working hard. Yes, it was a criminal situation, but he was working hard and making almost no money. It just shows that this is -- in his mind, what he thought, this is all I'm ever going to be able to do. And that's, I think, just the cycle that continued; that if he was making 500,000, 100,000 a year, 75,000 a year even, it would be different because he was making more money than, perhaps, he could make. In his mind he couldn't get any job; this was all he could do. He did this and put his family at risk. He put himself at risk for a huge sentence with a criminal history VI, for what, $125,000 over three years? It's absurd.

THE COURT: And therefore?

MR. LICHTMAN: Therefore --

THE COURT: I want to understand what you want me to draw from the fact that he didn't get rich.

MR. LICHTMAN: What I want you to draw, Judge, is the fact that this is not the typical defendant in this scheme, first of all. And secondly, to see that this is not somebody who was looking to get rich quick. This was not done out of greed, and I think that does make a difference. This was done simply to survive, in his mind.

THE COURT: Well, I'll give you the fact, he was a salesperson. I think that's all he was; the government will

correct me. But I mean, my goodness, he was in Consumer Shield. He was in Olive Branch. He knew exactly what he was doing.

MR. LICHTMAN: No question.

THE COURT: Yes, he wasn't a closer, he wasn't a leader, he wasn't a manager. That's right.

MR. LICHTMAN: And Judge, what I would say is the government put out their letter in 2019, relative culpability; they updated it with the tier A people recently, last month. There are 29 people in that letter. He's No. 22. He's got the highest guidelines by a mile.

THE COURT: I'm not sure. I think one of the other defendants has written a number of letters about that letter.

MR. LICHTMAN: I read your latest order this morning, Judge.

THE COURT: -- that government submission too much credibility.

Go ahead.

MR. LICHTMAN: What I would say, then, Judge, out of the 29 people, the people that have been sentenced, you've got people that were dealing kilogram-level quantities of cocaine while they were leaders in this organization. He was not just a leader, he was barely a salesman. He wasn't even trusted to close. That's how minor he was. That's why he made almost no money. So I think that in terms of where you slot him,

because, Judge, what you're here for today is not just to punish Derrek Larkin but to also slot him with regard to the other people that you're going to have to sentence down the road.

THE COURT: Thank you. Thank you.

MR. LICHTMAN: So if I look at these other people -- I've looked at it -- Christopher Wilson received 78 months. You've got people here that stole huge money, lived lavish lifestyles, were leaders, were owners, 78 months. 72 months for Jack Kavner. They were also dealing cocaine.

THE COURT: Do you have their criminal histories there? Are any of those in criminal history VI? You're giving me a little selective presentation here, which you're entitled to, sir.

I understand you're a good defense lawyer; you're making a selective presentation. But the 70 months bothers me.

Go ahead.

MR. LICHTMAN: What I would say, Judge, is that if they had the criminal history that he had, I'm not suggesting -- we can't make it disappear. What I'm saying is that the great bulk of it occurred while he was a young man. If he just had the criminal history from the West Virginia case, we would be nowhere near criminal history level VI.

THE COURT: Fair point.

MR. LICHTMAN: Most of the criminal history occurred

by the time he was 23, 24, and I think you have to at least agree that it's traced back to a pretty awful childhood.

THE COURT: And you have to agree there's a difference between swiping a snowblower and a 70-month federal drug sentence.

MR. LICHTMAN: No doubt, sir. No doubt. I'm not going to make that 600-pound gorilla disappear no matter what I do, but I just think that --

THE COURT: I don't mean to give you a hard time.

MR. LICHTMAN: I know, Judge.

THE COURT: I'm trying to understand this defendant.

MR. LICHTMAN: I suppose what I'm trying to do is explain how he got here today, because I consider this to be a vicious cycle that started with him when he was a very young boy. There's a reason why I'm not there, Judge, and he's not here. It's because I had a stable upbringing, and by the time I was 18, as I said, I was packing off to college. He was living in his car. There are some --

THE COURT: It's not the full answer.

MR. LICHTMAN: It's partly an answer.

THE COURT: I agree.

MR. LICHTMAN: OK?

I think also the fact that in this case, another part of it when you're considering sentencing decisions is you have to look at everybody else in the case. He's 22 out of 29, at

least according to that letter, with the understanding that your Honor's not looking at that as an ironclad set of rules. But he was a minor salesman. He made almost no money. He wasn't trusted to even close, so at least in that sense, you can see how minor he was. And, so that's part of it. And your response is, Well, I understand, but I need to give this man some specific deterrence. That's what you're thinking.

And what I would say, Judge, also in terms of other cases to compare it to, as I said, we stood here for hours over Kam Wong, who stole, who embezzled $10 million as CEO of a bank, who did the most, tiniest ridiculous frauds, about forging dental bills in order to steal $30,000; who had a Ferrari, had a Maserati, had a Mercedes. It was ridiculous what he was doing, the level that he was going in an effort -- and it went on for years and years, and he was stealing from vulnerable people as well. And the government didn't get that money back.

Do you remember the sentence, Judge?

THE COURT: No, sir.

MR. LICHTMAN: 66 months. The government, I think, asked for ten years in that case, and what I would say is Kam Wong --

THE COURT: So I've made mistakes.

MR. LICHTMAN: I thought you made a mistake too high, Judge. Of course I'm going to think that.

I guess my point that I'm trying to make is, and I'm trying to -- you're right. Any defense lawyer -- I'm here to selectively argue. You're the judge. Your position is to take my selective arguments, take their selective arguments, put them together and reach a fair decision.

What I'm saying, I suppose, is that when you came to the Kam Wong decision, you recognized that there was a lot of good despite a decade of bad. Here, what I would say, this is someone who started out so far behind the eight ball that he never seemed to get over it. He kept on -- the vicious cycle continued and continued and continued. And now, you know, when I look at where he is now, and you're saying to me basically why would I give this guy a chance? What can I look at to even suggest that he deserves a chance?

THE COURT: Well, I'm not sentencing him to -- 151 months is -- what -- 13 years. I'm not sentencing him to 13 years. I'm giving him a chance.

MR. LICHTMAN: I understand, Judge, but what I'm looking for, a more lenient --

THE COURT: I don't want his kids to not have a father. They're not going to have ready access to a father for quite some time, but I don't want them to be left without a father.

MR. LICHTMAN: I understand, and that's why you gave the generous sentence you did to Ms. Cirilo. I understand

that, Judge.

THE COURT: I wanted somebody home.

MR. LICHTMAN: I understand. Because you don't want the cycle to continue.

THE COURT: Right.

MR. LICHTMAN: I get it, but what I would say is that at least at this point, where we are today, you've got someone who finally realized that he can do this honestly, get a real job. He's got a young family. He's shown to be a great father, and I think that's important, because sometimes that cycle continues, Judge, and you have a bad father begats a bad father begats a bad father. At least at this point, now, all the letters make clear that he's been a wonderful father. He's the type of father that he wished he had when he grew up; perhaps he wouldn't be in the place that he's in now. And that's at least some growth that you can point to.

THE COURT: All right. Why don't you finish up. I understand your point.

MR. LICHTMAN: And Judge, lastly, what I would just mention, and this is certainly not the tail that wags the dog, he's got some significant health problems.

THE COURT: I saw that.

MR. LICHTMAN: And he's also been seeing, and I also would add, if I could just go back, is that he's been seeing a therapist for years -- it wasn't just when he was arrested in

this case -- to try to understand how he got here. It wasn't like he's not trying to understand. And I think that's what led to the position where he is today, where he's now, I believe, finally fixed. But with regard to the health issues, he's going into prison. Covid is rearing its ugly head again. He's got a mass in his chest. He's got other issues. He has not been able to get vaccinated because of his sickness.

THE COURT: I saw.

MR. LICHTMAN: And that's not going to help when he goes to prison.

THE COURT: No.

All right. Thank you. I understand.

MR. LICHTMAN: Thank you, Judge.

THE COURT: Government.

MS. FLETCHER: Yes, your Honor, briefly, and primarily to just address some of the questions that arose during the Court's conversation with Mr. Lichtman.

The Court is right. Mr. Larkin was a salesman. He was only ever a salesman. That's what puts him, in the government's view, in tier 3 in our letter addressing relative culpability.

What I would point out to the Court with respect to that letter is that though he is a salesman, he is near the top of the list of salesmen. He is above Andrew Owimrin, for example, and there are a couple of reasons for that.

First, in addition to being a salesman at Olive Branch Marketing and later at Consumer Shield, the debt relief spin-off of Olive Branch Marketing, the defendant was aware about issues with merchant accounts, issues with charge-backs that existed at Olive Branch, and himself opened up a merchant account that could be used to further this scheme that was going on at Olive Branch.

And as the Court will recall from the trial of Andrew Owimrin, the debt-relief scheme, operating under the name Consumer Shield, was essentially a scheme to sell debt-relief services to victims who were broke because they had purchased BizOps Services, and though the defendant was not a closer on that floor, he was the person responsible for calling the victims and saying something to the effect of: We hear you've lost all your money in BizOps. Do you want us to help negotiate a settlement of your various credit card debts?

And so, like Andrew Owimrin, in the government's view, that's a pretty strong reflection of his knowledge that this, that Olive Branch was operating a criminal scheme. That knowledge, from his perspective, and I made these points with respect to Ms. Cirilo, was only solidified when his home was searched in 2017 and when several of his coworkers, including his former bosses, were charged criminally and either pleaded guilty or were convicted after trial.

So notwithstanding that, the fact that he participated

in that scheme for many years and had not been charged, that he -- it was a near miss, I would say, from this defendant's perspective, and notwithstanding that near miss, he decided to go and work for another BizOps floor, where he continued to speak to customers; where, when law enforcement came knocking, he engaged in obstruction and wiped evidence from his cell phone and, the government suspects, encouraged his wife to do so, which is one of the things that landed her before this Court.

And so all of those facts, yes, the defendant was only a salesman, but he was more culpable than many, many other salesmen who have found themselves within this scheme. And the guidelines take into account the fact that he was not a leader; that he does not have leadership points. He does have obstruction points. And so the government's view that he's sort of somewhere in tier 3 in terms of his role in the offense and his culpability in the offense is, in the government's view, supported.

The difference, of course, between him and the other defendants in tier 3 is his very, very serious criminal history, and that is why the government submits that a sentence within the stipulated guidelines range, not the guidelines range that the Court has found applies here --

THE COURT: The bottom is 92, if I remember correctly.

MS. FLETCHER: That's right, your Honor.

-- that that is what leads the government to its recommendation that the defendant be sentenced within that range, and that is, exactly as Mr. Lichtman said, because of the need for specific deterrence here for this defendant in light of his history both before this case ever started and the facts that the Court has learned about this defendant during this and the prior case.

Those were the points I wanted to make, your Honor.

Unless the Court has any questions, the government's happy to rest on that and its submissions.

THE COURT: All right. Thank you.

Mr. Larkin, you've heard my concerns. You have the right to speak to me, sir. You don't have to. Anything you say can be used against you, but you can tell me anything you'd like.

THE DEFENDANT: First, I would like to thank you for allowing me to speak today, Judge.

I've made a lot of mistakes in my past, before, that I'm not proud of. Just recently, over the last couple years, I decided to seek therapy to try to help me with some of those issues and understand why those mistakes were made.

Excuse me.

THE COURT: Take your time.

THE DEFENDANT: Now having a family and being able to get into the ironworkers union and see that I could head down a

straight path, I'm -- you know, I'm grateful for that. That's something I really am grateful for. I'm somewhat haunted about, you know, reading about all this stuff with these victims and what's been done to them, and I want to apologize to them. If I could apologize to each and every one of them, I would do that, and I feel terrible for -- give me one sec here.

I feel terrible for everything that's happened. I never thought I would see myself in this position again. I never wanted to see myself in this position again is what I should say, and I think that -- I think that I am a good person who's made a lot of mistakes. And you know, I think that my future intentions are absolutely good now.

You know, this ironworkers job is probably the best thing that's ever happened to me, you know, besides my family. It's given me, you know, something that I never thought I would have as far as good pay, benefits, and consistent work.

So with that being said, I would -- I would again like to apologize to you, to the victims in this case, and I just want to say I'm sorry.

THE COURT: Let me ask you a question that I sometimes find it appropriate to ask. Sometimes people can't answer it.

You had more than a taste of prison, both state jail and the very serious federal prison sentence for drugs. Because of your work at Olive Branch, because of your knowledge of what was happening in Ketabchi, because of what you were

doing on the sales floor, you knew all of this was wrong, and you knew what prison looked like and smelled like and felt like, and you knew what it could do to a family -- I don't think you had a family at that point.

Given all that, why did you do this?

THE DEFENDANT: I think that I just didn't think -- I just didn't think it was possible for me to, you know, obtain a job like an ironworker or something like that, so I kind of strayed off. I kind of strayed off the path that I was trying to, you know, create for myself and I rationalized it. And by rationalizing it, you know, I put it in my head that -- that it was, that it was OK for a little while. And then I just -- I just -- excuse me. I'm sorry. Just give me a second here.

THE COURT: Take all the time you need.

THE DEFENDANT: I just wanted to try to get my life together, and when I had that opportunity presented me in the future, I was -- you know, I was able to see. I actually -- I actually like the ironworkers. It's a very grueling job, but it's -- it's a good job, and I just -- I don't know. I never saw myself having an opportunity to do something like that, so that's where the rationalization comes in.

THE COURT: Do you think you're able, are you able to keep this job after you come out?

THE DEFENDANT: I hope so.

THE COURT: Did you explore that with anyone in the

union?

THE DEFENDANT: I haven't really spoken to anybody about it yet until I saw what, saw what would happen today.

THE COURT: All right. Thank you, sir. You may be seated.

I think you should continue to work on trying to figure it out.

There are a number of considerations here, which I'm sure your lawyers explained to you. One of them is punishment. Part of punishment depends on the criminal history category you're in, not as a rote matter, because the guidelines are advisory at this point; they're not mandatory, but they are a function of your criminal history, of the illegal things you have done and gotten punished for in the past. It has to be taken into account.

So punishment is relevant here, as is specific deterrence, which I think is also relevant in your case, given your history, and important as well, general deterrence. If you were following any of the sentences in the Ketabchi case, you know that's a factor.

These scams are extremely painful, hurtful. I don't know if you've read any of the testimony of the victims in Ketabchi. People were ruined. Some people were absolutely ruined. People's retirements disappeared. They had no idea how they were going to live. People broke down on the stand

here. There was one woman who testified by video. It was clear she wasn't all there, but she was hounded -- not by you -- to my knowledge, not by you. But to the extent the law has a role to play in making sure other scams don't start or other scams aren't continued or for that matter that people understand that there are criminals afoot who are trying to steal their money from them, including you, significant sentences make sense.

Nonetheless, even if I were to find that it was an appropriate sentence, 92 months, which I don't, a variance is appropriate here. I'm going to sentence this defendant to 72 months' incarceration; five years' supervised release. That's higher than I would normally do, but given the expanse of prior criminal undertakings and crimes, I think five years of supervised release makes sense.

I will say for the record I certainly hope he is able to keep his job. That job is important, and it's a worthwhile and meaningful job, and I think it helps Mr. Larkin have meaning in his life, through a more valuable outlet than the prior outlets he's found. So to the extent the union allows him to keep the union accreditation and his job, that, I think, will be of great assistance in his rehabilitation.

I've signed the forfeiture order.

What's the position of the government on restitution?

MS. FLETCHER: Your Honor, the government would ask to

submit a proposed restitution order for this defendant within 90 days. And as the government indicated at Ms. Cirilo's sentencing, we anticipate that the proposed restitution sum will be joint and several for many of the defendants currently in the Cheedie case.

THE COURT: What's the position of the defense? I'm inclined to give the government 90 days. The statute certainly does.

MR. LICHTMAN: Judge, that's fine.

THE COURT: All right.

Prior to 90 days, I want a submission on restitution from the government with a position of what the defense is and a submission from the defense if the defense disagrees with the government's position.

All right. Mr. Larkin, if you would stand.

I hereby find the offense level is 29. The criminal history category is VI. The guideline range is 151 to 188 months. Pursuant to the Sentencing Reform Act of 1984, it is the judgment of this Court that the defendant, Derrek Larkin, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 72 months.

Upon release of imprisonment, Mr. Larkin shall be placed on supervised release for a term of five years with the conditions recommended by the probation department.

He will be sentenced to the mandatory conditions that

are set forth on page 37 of the PSR, which is document 211. In addition, Mr. Larkin shall comply with standard conditions 1 through 12, which are set forth on pages 37 and 38 and 39 of the presentence report. I also sentence Mr. Larkin to the special conditions which are set forth on page 39 of the presentence report, including the search condition, outpatient treatment condition, access to requested financial information condition, not incurring new credit charges condition, and that he be supervised by the district of residence while on supervision.

I'm not imposing the third-party risk condition, but all other special conditions set forth on page 39 are now imposed.

Within 72 hours of release from the custody of the Bureau of Prisons, Mr. Larkin shall report in person to the probation department in the district to which he is released.

I'm not imposing a fine because I find he lacks the ability to pay a fine, after taking into account the presentence report as well as the forfeiture and the expected restitution order here.

I'm giving the government 90 days to propose a restitution order.

I hereby order Mr. Larkin to pay to the United States a special assessment of $100, which is due immediately.

I've sentenced Mr. Larkin below the guideline range.

And I should say and I've put on the record before, if I had granted the three points down for acceptance of responsibility such that the guideline range, bottom of the guideline range would have been 92 months, and the offense level would have been 26 with a criminal history category of VI, my sentence would still be the same.

It's based on his remorse. It's based on his family circumstances, based on the fact that he has a solid job, and I want him to be able to return to that job. Those are the reasons for the variance.

I believe the sentence is appropriate given the seriousness of the offense and the defendant's criminal history and the need for punishment and deterrence.

Mr. Larkin shall surrender for service of sentence at the institution designated by the Bureau of Prisons on or before 2 p.m. on September 10, 2021.

MR. LICHTMAN: Your Honor, because of his health situation, the fact that he's going to receive a scan every three months to see if this growth has changed, I would respectfully ask if we could have a surrender of 90 days to let him have the next scan while he is out, because I'm afraid if he goes in --

THE COURT: How often is the scan?

MR. LICHTMAN: Three months.

THE COURT: There's one this week, right?

MR. LICHTMAN: He had it a while back, and he received the results a couple of days ago. It has not grown, but they insisted that he come back within three months. So it would be before the 90 days out that he have the next scan.

THE COURT: What's the position of the government?

MS. FLETCHER: Your Honor, this strikes the government as something that is going to recur every 90 days, and so the government would favor keeping the defendant's surrender date five weeks from now, and I expect there will also be a request from Mr. Lichtman that the Court recommend the defendant be designated to a facility that can address these and other medical conditions that may arise.

MR. LICHTMAN: Judge, short of there being a change in his condition, I see no reason to ask for anything else. If there's something that requires surgery to remove a cancerous mass, that may be something that would get me back here. But I understand the severity of the sentence and I understand that I'm also only asking for one more scan. He needs to go to a few doctors as well during this period. He does have significant other conditions.

THE COURT: I'll do the 90 days. The surrender date is November 5. At or before 2 p.m. on November 5.

MR. LICHTMAN: Thank you, Judge.

THE COURT: Do either counsel know of any legal reason why the sentence should not be imposed as I have stated it?

Mr. Lichtman.

MR. LICHTMAN: No, your Honor.

THE COURT: Ms. Fletcher.

MS. FLETCHER: No, your Honor.

THE COURT: I hereby order the sentence to be imposed as I have stated it.

Mr. Larkin, you have the right to appeal the sentence I've just imposed on you. If you cannot pay the cost of an appeal, you have the right to apply for leave to appeal *in forma pauperis*.

Ms. Fletcher, in the plea agreement, what was the top of the range on a limited waiver?

MS. FLETCHER: Your Honor, I believe it was 115 months.

THE COURT: Is that your way of saying that's what it was, or are you saying something short of that?

MS. FLETCHER: I'm saying something short of that. May I have a moment, your Honor?

THE COURT: Why don't you look it up in the PSR.

MS. FLETCHER: That's exactly what I'm doing, your Honor.

I'm now confident it was 115 months.

THE COURT: All right.

Mr. Larkin, I do wish to inform you that in your plea agreement you agreed to waive your right to appeal the sentence

and you agreed to waive the right to collaterally attack the sentence to the extent I sentenced you to 115 months or fewer months, and indeed, I've sentenced you to far fewer months, specifically 72 months.

Do you understand your appeal rights, sir?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

Mr. Lichtman, do you have a recommendation that he be housed in the tristate area in order to facilitate family visits? I'd like him to be able to keep some touch with his family.

MR. LICHTMAN: Yes, your Honor.

THE COURT: I hereby recommend to the Bureau of Prisons that Mr. Larkin be housed in the tristate area in order to facilitate visits with his family, who live in New Jersey.

Anything else?

Mr. Lichtman.

MR. LICHTMAN: Nothing from the defense.

THE COURT: Government.

MS. FLETCHER: Your Honor, the government moves to dismiss open counts at this time.

THE COURT: Thank you. Granted.

Mr. Larkin, you're going to have to figure out what really led you to do so this. It wasn't a lapse of a moment or two. It's a number of lapses. It's not a lapse of youth only,

as Mr. Lichtman would have it, but serious criminal undertakings as an adult. I think you're on your way to figuring it out. I think your job will help you never fall back into that. Not only for the money, I don't think it's the money. I don't think you were motivated by money the way other people are. I think your family will help you. I think your job will help you, and it's you who will help you the most.

Good luck to you, sir. I never want to see you again. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Thank you.

(Adjourned)